Leon Cannizzaro, District Attorney, Scott G. Vincent, Assistant District Attorney, DISTRICT ATTORNEY'S OFFICE, ORLEANS PARISH, 619 S. White Street, New Orleans, LA 70119, COUNSEL FOR STATE OF LOUISIANA
Kevin V. Boshea, ATTORNEY AT LAW, 2955 Ridgelake Drive, Suite 207, Metairie, LA 70002, COUNSEL FOR DEFENDANT/APPELLANT
(Court composed of Judge Edwin A. Lombard, Judge Sandra Cabrina Jenkins, Judge Regina Bartholomew Woods )
Judge Edwin A. Lombard *32 The defendant, George Smith, appeals his convictions on one count of stalking a person under a protective order, a violation of La. Rev. Stat. 14:40.2, and ten counts of violation of a protective order, violations of La. Rev. Stat. 14:79. After review of the record in light of the applicable law and arguments of the parties, the defendant's convictions are affirmed in part and reversed in part.
Relevant Facts and Procedural History
The defendant is the former live-in boyfriend of Ms. Trina Johnson and father of her youngest child. Their live-in arrangement ended during Ms. Johnson's pregnancy, but the couple maintained contact. In late September of 2014, however, an altercation occurred at the defendant's business location in Belle Chasse, Louisiana, which resulted in criminal proceedings being instituted against the defendant in Plaquemines Parish. On October 8, 2014, a protective order was issued clearly stating that for a one-year period the defendant was not to: (1) abuse, harass, stalk, follow, or threaten Ms. Johnson; (2) contact Ms. Johnson personally, electronically, by phone, in writing, or through a third party, or to go within 100 yards of Ms. Johnson; (3) contact Ms. Johnson's family personally, by phone, electronically, in writing or through a third party; or (4) go to Ms. Johnson's household or residence, school, or place of employment.
On October 28, 2015, the defendant was charged by bill of information with one count (Count 1) of stalking a person under a protective order during a four month period after imposition of the protective order, as well as fifteen counts (Counts 2 through 16) of violating the protective order on specific dates during the same four month period. The defendant was arraigned on November 12, 2015, and pleaded not guilty to all counts. Just prior to trial on January 9, 2017,[1] the State noted its intent to offer evidence of similar crimes, wrongs, or acts in domestic abuse cases and the evidence was ruled admissible. A jury found the defendant guilty on Count 1 and the trial court ordered the parties to file memorandum of law on the remaining fifteen counts. In its memoranda filed on January 24, 2017, the State referenced only counts two through eight and counts ten through twelve.
The trial court found the defendant guilty on the counts referenced in the State's memoranda (Counts 2-8, 10-12) on February 10, 2017. The defendant was subsequently sentenced, with credit for time served and twenty-one months suspended, to serve ninety-days of a two year sentence at the Department of Corrections at hard labor on Count 1, the stalking conviction. The defendant was sentenced to six-months, suspended, with six months of inactive probation on each of the remaining convictions for violation of the protective order, all sentences to be served concurrently with each other and any and all other sentences imposed.
In this timely filed appeal, the defendant challenges: (1) the sufficiency of evidence underlying his convictions; (2) the admission of evidence of similar crimes, wrongs, or acts in domestic abuse cases; and (3) being convicted simultaneously for individual violations of a protective order and stalking a person for whose benefit a protective order was issued.[2]
*33 Assignment of Error 1
The defendant argues that the evidence is insufficient to support the convictions for violation of the protective order because there were inconsistencies in the testimony of the witnesses and because, in violation of Napue v. Illinois , 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the State introduced false testimony by Ms. Johnson and her husband, Mr. Roy, which they failed to correct.
Applicable Statutes
La. Rev. Stat. 14:40.2, the stalking statute, provides in pertinent part:
A. Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted. (emphasis added)
....
B. (3) Any person who commits the offense of stalking against a person for whose benefit a protective order, a temporary restraining order, or any lawful order prohibiting contact with the victim issued by a judge or magistrate is in effect in either a civil or criminal proceeding, protecting the victim of the stalking from acts by the offender which otherwise constitute the crime of stalking, shall be punished by imprisonment with or without hard labor for not less than ninety days and not more than two years or fined not more than five thousand dollars, or both.
La. Rev. Stat. 14:79, violation of protective orders, provides in pertinent part:
A. (1)(a) Violation of protective orders is the willful disobedience of a preliminary or permanent injunction or protective order issued pursuant to R.S. 9:361 et seq., R.S. 9:372, R.S. 46:2131 et seq., R.S. 46:2151, R.S. 46:2171 et seq., R.S. 46:2181 et seq., Children's Code Article 1564 et seq., Code of Civil Procedure Articles 3604 and 3607.1, or Code of Criminal Procedure Articles 320 and 871.1 after a contradictory court hearing, or the willful disobedience of a temporary restraining order or any ex parte protective order issued pursuant to R.S. 9:361 et seq., R.S. 9:372, R.S. 46:2131 et seq., R.S. 46:2151, R.S. 46:2171 et seq., criminal stay-away orders as provided for in Code of Criminal Procedure Article 320, Children's Code Article 1564 et seq., or Code of Civil Procedure Articles 3604 and 3607.1, if the defendant has been given notice of the temporary restraining order or ex parte protective order by service of process as required by law.
La. Rev. Stat. 15:438 requires that when circumstantial evidence is used to prove the commission of an offense, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
Applicable Jurisprudence
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, *34 viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. State v. Cummings , 95-1377, p. 3 (La. 2/28/96), 668 So.2d 1132, 1134. Rather than being a separate test, La. Rev. Stat. 15:438 insures that, when circumstantial evidence forms the basis of the conviction, the evidence is sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt in accordance with the Jackson v. Virginia due process standard. Id.
It is axiomatic that a reviewing court shall not substitute its own appreciation of the evidence for that of the jury; likewise, credibility determinations, which are questions of fact within the sound discretion of the trier of fact, will not be disturbed on appeal unless they are clearly contrary to the evidence. State v. Lubrano , 563 So.2d 847, 850 (La. 1990) (citation omitted); see also State v. Cummings , supra ("It is not the function of an appellate court to assess credibility or reweigh the evidence."). Accordingly, in the absence of internal contradiction or an irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Rapp , 14-0633, pp. 6-7 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108 (citing State v. Marshall , 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 ). Thus, when there is conflicting testimony about factual matters and the resolution depends upon a credibility determination of a witness, it goes only to the weight, not the sufficiency, of the evidence. State v. Edgar , 12-0744, p. 16 (La. App. 4 Cir. 9/18/13), 140 So.3d 22, 34, writ denied , 13-2452 (La. 4/4/14), 135 So.3d 638 (citation omitted).
To prove a Napue claim, "the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony," and, if the prosecutor allowed a State witness to give false testimony without correction, "the conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness." State v. Broadway , 96-2659, p. 17 (La. 10/19/99), 753 So.2d 801, 814, cert. denied , 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (citations omitted).
Relevant Evidence Adduced at Trial
Ms. Trina Johnson testified that she financially supports her four children as a nurse, embalmer, and funeral director. In late September of 2014, Ms. Johnson and her mother, along with Ms. Johnson's eleven year-old son, nephew, and youngest child gave the defendant a ride from to his body shop in Belle Chasse, Louisiana. When they arrived, the defendant got out of the truck and, leaving the truck door open, went inside the shop. His son (Ms. Johnson's youngest child) followed him into the shop and Ms. Johnson followed to retrieve the child. She picked up the child but, before she could leave, the defendant angrily accused Ms. Johnson (who had just returned from the Saints-Cowboys football game) of going to the game with a man and "messin around" on him. The defendant became violent and hit her. Picking her up by the neck, the defendant threatened Ms. Johnson, telling her he would kill her and anyone she loved if he caught her with another man. Ms. Johnson started screaming and her mother rushed in, separating the defendant and Ms. Johnson. The women screamed for Ms. Johnson's older son, Demontre, (who had remained in the truck) to call 911. The defendant ran to the truck, snatched the phone from Demontre, and threw it. The defendant then grabbed the baby, took the phone, and drove off in another car. The women called 911.
*35 As a result of this incident, criminal proceedings were instituted in Plaquemines Parish and the protective order at issue in this matter was signed on October 8, 2014, prohibiting the defendant from abusing, harassing, stalking, following, or threatening Ms. Johnson, contacting her in any manner or going within 100 yards of her, contacting her family in any manner, or going to her home or place of employment. Nevertheless, the defendant continued to contact Ms. Johnson, sending her a series of texts on October 30, November 2, November 3, and November 11, 2014, copies of which were identified by Ms. Johnson and submitted into evidence.
In addition, Ms. Johnson testified that on November 5, 2014, the defendant approached her as she arrived at the nursery to drop off her youngest child. He said he wanted to talk to her about their relationship and asked to visit with the baby. Ms. Johnson agreed to let him talk to the baby for a minute on the condition that he leave her alone. Ms. Johnson then took the child inside the nursery and, a short time later (once the defendant's car was gone), returned to her vehicle. When Ms. Johnson tried to move her car, however, the defendant drove up and blocked her vehicle so she was unable to leave. Ms. Johnson was on the phone with Mr. Roy at the time and told him she was going to have to call the police. Ms. Johnson locked herself in her vehicle and waited for the police to arrive. Mr. Roy arrived prior to the police and asked the defendant to move out of Ms. Johnson's way. The defendant ultimately left the scene prior to the arrival of the police. When the police arrived, Ms. Johnson gave a statement, and a warrant, which was introduced into evidence, was issued for defendant's arrest.
On November 6, 2014, Ms. Johnson, accompanied by Mr. Roy, drove to her mother's house. When she arrived, however, she observed the defendant with her mother outside of the house. She and Mr. Roy remained in the vehicle and Ms. Johnson called to her mother, asking why the defendant was at her house. The defendant started screaming and cursing at Ms. Johnson, telling her that he was going to kill her and Mr. Roy. Ms. Johnson was frightened. She and Mr. Roy drove away, followed by the defendant. Ms. Johnson and Mr. Roy went to the Fifth District station to file a complaint. Both the application for an arrest warrant and the arrest warrant, alleging that on November 6, 2014, the defendant committed simple assault and violated the protective order, were submitted into evidence.
Ms. Johnson testified that on November 27, 2014, the rear window of Mr. Roy's car was broken while parked outside of her home.[3] Ms. Johnson stated that she believed the defendant had damaged the vehicle because the defendant had previously threatened both her and Mr. Roy on numerous occasions. In addition, Ms. Johnson testified that a black Pontiac Firebird owned by her son, Jodi Williams, was damaged on January 17, 2015, while it was parked outside her house. Specifically, "G Smith" was scratched, or "keyed," into the paint in a handwriting which Ms. Johnson stated that she recognized as the defendant's handwriting. Photographs depicting the damaged vehicles were introduced into evidence.
Ms. Johnson testified that, as a result of the ongoing harassment and threats by the defendant, she had altered many aspects of her life. She changed jobs (from nursing to working at a funeral home) because the defendant harassed her at patients' houses. Once she changed careers, the defendant threatened a worker at the funeral *36 home so she once again changed jobs. Ms. Johnson also changed the buses her children took to school and her daily routine out of fear of running into the defendant. While the protective order was in place, Ms. Johnson and her children moved out of their home for three months and moved in with her mother and various friends because defendant kept breaking into her home. Ms. Johnson had burglar bars installed and the bedroom windows nailed shut by a carpenter but, according to Ms. Johnson, the defendant subsequently took the bedroom window out. Ms. Johnson ultimately installed security cameras at her home.
On cross-examination, defense counsel asked Ms. Johnson whether the defendant was the first man she had ever accused of domestic violence, to which she answered "yes." Defense counsel then asked whether she had accused Cedric Roy, her present husband, of domestic violence. Ms. Johnson denied she had ever accused Cedric Roy of domestic violence. Ms. Johnson stated, "We had a, the police was [sic] was called but it wasn't from me with Cedric. It was Cedric and George (the defendant)." Defense counsel asked whether she had accused Mr. Summers. Ms. Johnson replied, "No, George wanted to kill him too.... Because that's always the problem. If any other person came around, or they had a disagreement, the police was [sic] called."
Defense counsel also questioned Ms. Johnson as to her medical history pertaining to the conception of her child with the defendant and other matters. In the course of cross-examination, Ms. Johnson related that she was eight months pregnant when she discovered the defendant's infidelity and the defendant moved out of her home.
Mr. Roy testified that he has known the defendant for about ten years and Ms. Johnson, who he started dating in the latter part of 2014 and is currently married to, for eleven years. In October 2014, Mr. Roy was aware of the protective order and the circumstances surrounding it. On November 5, 2014, Ms. Johnson called him on the phone when the defendant appeared at her son's daycare. He drove over to the daycare and, when he arrived, he saw the defendant talking to Ms. Johnson. When the defendant saw Mr. Roy he stated: "N------, I can have you killed. N------, do you know who I am?" Mr. Roy stated that he had no reason to doubt the defendant meant what he said.
On the following day, November 6, 2014, Mr. Roy drove Ms. Johnson to the home of her mother, Janice Watson. When they arrived (at approximately 9 a.m.), Ms. Watson was in the front yard with her sick dog. Shortly thereafter, the defendant drove up and threatened Mr. Roy and Ms. Johnson saying, "I can have you touched. I can kill you." When Mr. Roy and Ms. Johnson told him them that they were going to call the police, the defendant responded that he did not care about the police or the law. Mr. Roy and Ms. Johnson drove directly to the Fifth District Police Station to report the threat.
On cross-examination, Mr. Roy denied Ms. Johnson accused him of criminal activity in the past. Regarding the incident at the daycare center on November 5, 2017, Mr. Roy testified that he saw defendant talking to Ms. Johnson in her vehicle as he arrived. Ms. Johnson's vehicle was parallel parked and Mr. Roy parked his vehicle on the side parallel to Ms. Johnson's. When he got out of his vehicle, the defendant told him, "I can have you touched, I can have you killed." The defendant returned to his vehicle and left. Once defendant left, Ms. Johnson and Mr. Roy left. Mr. Roy did not recall seeing the police at the daycare center, but stated Ms. Johnson had spoken to them on the phone.
*37 Mr. Roy also testified as to an incident that occurred during the period of the protective order when he was in Ms. Watson's living room and the defendant barged in asking, "What this N------doin' up in here? Additionally, Mr. Roy testified that on Thanksgiving in 2014, the rear window of his SUV was broken and he attributed the damage to the defendant because he had "no type of issues or beef" with anyone other than defendant at the time.
Ms. Watson testified that the protective order against the defendant arose out of an incident of domestic abuse that occurred in late September of 2014, when she and Ms. Johnson gave the defendant a ride to Belle Chasse. She affirmed that the defendant's two-year old son followed him into the defendant's body shop and Ms. Johnson went inside to get the baby. Shortly thereafter, Ms. Watson went inside the office and, observing that the defendant had Ms. Johnson against the wall, pushed him off her daughter while calling to her grandson (Demontre) to call the police. The defendant then ran to Ms. Watson's vehicle, yanked the phone from Demontre, and threw it. He then grabbed the baby and drove off in his car. The women called 911 and filed a domestic violence complaint which resulted in the issuance of the protective order applicable in this case.
Ms. Watson affirmed that following the issuance of the protective order, the defendant came to her house to ask her to talk to Ms. Johnson about letting him see his baby. Ms. Johnson and Mr. Roy came by and when Ms. Johnson saw defendant, called out asking why Ms. Watson was talking to him. The defendant started screaming and cursing at Ms. Johnson and threatened to "hurt" Ms. Johnson and Mr. Roy. When Ms. Johnson and Mr. Roy started to drive away, the defendant jumped into his vehicle and followed them. Ms. Watson also recalled the incident when Mr. Roy was speaking with her inside her home and the defendant barged in demanding to know why Mr. Roy was there. Ms. Watson conceded on cross-examination that she did not recall the exact date of this incident but knew that, under the provisions of the protective order, the defendant was not supposed to come to her home. However, the defendant told her he was not concerned about the protective order or the police. Ms. Watson stated she was concerned for her daughter's safety.
Jodi Williams,[4] Ms. Johnson's son, testified that he lives with his mother on McKendall Place in New Orleans East. He testified that in January 2015 he went outside and saw "GS" and "G. Smith" keyed into the back of his car. He also discovered that his laptop and other things had been stolen from the car. He did not recall the exact date but stated that the police were called immediately after he discovered the damage and missing items. Photographs of the damage were submitted into evidence.
Officer Kahlid Watson of the New Orleans Police Department (NOPD) testified that on November 5, 2014, he responded to a dispatch call of a domestic disturbance in the 4200 block of Marigny Street and, upon arrival, spoke to complainant, Ms. Johnson. Ms. Johnson reported that the defendant confronted her at her child's daycare in violation of a protective order she had obtained against him. After confirming with the registry that the protective order was still valid, Officer Watson obtained a warrant for defendant's arrest on the charge of violation of a protective order.
Officer Donald Blackwell of the NOPD testified that on November 18, 2014, he *38 responded to a call of a vehicle burglary at 5120 McKendall Place which had occurred between November 16 and 17, 2017. Upon arrival on the scene, he observed the vehicle and spoke with the victims, Jodi Williams and Trina Johnson, who reported a laptop computer and ear buds had been taken from the vehicle and the wooden fence on the property had been damaged.
Officer Tyrone Parker of the NOPD testified that he was dispatched to 5120 McKendall Place twice in a short period of time regarding incidents involving vehicle damage and on both occasions the homeowner, Ms. Johnson, stated she believed her ex-boyfriend (the defendant) caused the damage. Specifically, Officer Parker was dispatched on November 27, 2014, (Thanksgiving), to investigate a complaint of criminal damage to a vehicle and observed the broken rear window of an SUV belonging to Cedric Roy. Although there were no witnesses to the window being broken, Mr. Roy informed Officer Parker he believed that a former boyfriend of Ms. Johnson had broken the window. On January 17, 2015, Officer Parker was again dispatched to 5120 McKendall Place where he observed a vehicle had been keyed leaving marks and scratches. However, Officer Parker conceded that the police report pertaining to that incidence indicated that, although the criminal damage was reported as having occurred on January 17, 2015, at 8 am, the police were not actually called until January 18, 2015, at 5:12 pm. Moreover, the police report indicates only criminal damage, not that a laptop or anything else had been stolen from the vehicle.
Officer Nicole Jones, a NOPD communications officer, identified the 911 calls associated with NOPD Item Nos. J-22795-14, K-32937-14, A-21080-15, and K-19830-14, and the 911calls were played to the jury.
Tanisha Fisher testified on behalf of the defendant, who she described as her "boyfriend," that they began dating in late 2011 or early 2012. In early 2012 when Ms. Johnson knocked on her door and, when she opened it, she saw Ms. Johnson standing by the defendant's truck with the door open. Ms. Fisher followed Ms. Johnson to her vehicle and sat in the passenger seat talking to her. Ms. Johnson "took off driving" towards the defendant's home. Ms. Johnson saw the defendant and began driving very fast, following him on the interstate and calling him on the phone. After Ms. Fisher yanked the phone out of Ms. Johnson's hand and talked to the defendant, Ms. Johnson returned Ms. Fisher to her home. On cross-examination, Ms. Fisher confirmed that the incident she described occurred when Ms. Johnson was pregnant, shortly after she began dating the defendant, and two years prior to the issuance of the protective order pertinent to this case.
The defendant testified that he was the father of six boys, including Ms. Johnson's youngest son. He conceded he had a 1995 conviction for possession of stolen property valued in excess of $500 and a 1994 conviction for altered or removed vehicle identification number. The defendant stated that he began dating Ms. Johnson in 2006 and moved in with her (and her children) shortly thereafter but was no longer living with her by the end of 2011. Regarding the incident in September 2014, he asserted that it began when he told Ms. Johnson that he would no longer be helping her with her bills because she had money to go to the Saints game. He contended, however, that the argument never became physical. He denied vandalizing either Mr. Roy's or Mr. Williams' vehicles or taking a laptop from Mr. Williams' vehicle. He denied confronting Ms. Johnson at their child's daycare. He denied that any incident occurred at Ms. Watson's house involving *39 Mr. Roy and Ms. Johnson in November 2014. The defendant conceded that an incident occurred at Ms. Watson's house where he entered and Mr. Roy was there, but insisted that it occurred in 2012 when he brought diapers to Ms. Watson who was taking care of his son. The defendant declared that he never violated the protective order.
Officer Ashley Boult of the NOPD testified for the defense that she remembered investigating a criminal complaint made by Ms. Johnson where Mr. Roy was the name of the accused. No further information was forthcoming, nor was a police report reflecting this incident introduced into evidence.
Analysis
First, with regard to the defendant's arguments that the evidence is insufficient because the testimony of the witnesses was inconsistent, the credibility of the witnesses and weight of the evidence is within the sound discretion of the trier of fact and will not be overturned on appeal unless clearly contrary to the evidence.
With regard to the Napue claim, the defendant challenges the credibility of Ms. Johnson and Mr. Roy based on their denial of a domestic abuse complaint being filed by Ms. Johnson against Mr. Roy. The record shows, however, that in responding to questions on this issue, both witnesses indicated that any complaint purported to be against Mr. Roy was in connection to a call about the defendant. Officer Boult, called as a defense witness, testified that she "remembered" investigating a criminal complaint made by Ms. Johnson where Mr. Roy was the name of the accused. However, no further information was elicited, nor was a corroborating police report reflecting this incident introduced into evidence. Notably, witness credibility and the weight of the evidence is determined by the trier of fact and, in this case, even accepting arguendo that Office Boult's testimony constitutes evidence of false testimony by Ms. Johnson and Mr. Roy, to the extent that the State presented false testimony, it was corrected by Officer Boult. This argument is totally meritless.
The defendant was convicted of Counts 1-8 and 10-12. Count 1 charged the defendant with the crime of stalking by willfully, maliciously, and repeatedly following or harassing another person between October 18, 2014, and January 30, 2015. With regard to violations of the protective order, Counts 2-16, the bill of information only refers generically to violations on specific dates without relating any narrative description of the alleged violation on that date. Thus, according to the bill of information, the defendant violated the protective order that was issued on October 8, 2014, on the following dates:
Count 2-November 6, 2014
Count 3-November 5, 2014
Count 4-November 6, 2014
Count 5-October 18, 2014
Count 6-November 18, 2014
Count 7-November 27, 2014
Count 8-January 17, 2014
Count 10-October 30, 2014
Count 11-November 2, 2014
Count 12-November 3, 2014
Count 1
The State witnesses presented testimony, supported by documentary evidence, of numerous events relating to the defendant contacting, following, and harassing Ms. Johnson and her family in the period between mid-October 2014 and the end of January 2015. Beyond the date-specific allegations of malicious contact and harassment contrary to the protective order, Ms. Johnson related that during this period she found it necessary to *40 change jobs, evacuate her home, and install security cameras to avoid the defendant's harassment and stalking. Accordingly, viewed in the light most favorable to the prosecution, any rational juror could find beyond a reasonable doubt that the defendant willfully, maliciously, and repeatedly followed or harassed Ms. Johnson during that time period. Sufficient evidence supports this conviction.
Counts 2, 10, 11, and 12
The evidence clearly indicates that the defendant sent text messages to the Ms. Johnson on October 30, November 2, November 3, and November 6. This contact was in direct violation of the protective order which prohibited the defendant from contacting Ms. Johnson "personally, electronically, by phone, in writing." Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could find beyond a reasonable doubt that sufficient evidence supports the defendants convictions on counts 2, 10, 11 and 12.
Count 3
This conviction is based on the incident at the daycare when the defendant confronted Ms. Johnson as she was dropping their son off at daycare. Specifically, on November 5, 2014, the defendant approached Ms. Johnson at the daycare and blocked her vehicle when she attempted to leave after taking her child inside the daycare center in violation of the protective order. Although the defendant left before the police responded to Ms. Johnson's call from her locked vehicle, the violation of the protective order frightened Ms. Johnson, she filed a complaint, and an arrest warrant was issued. Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could find beyond a reasonable doubt that sufficient evidence supports the defendant's conviction on Count 3.
Count 4
This conviction is based on the incident at the home of Ms. Johnson's mother. Specifically, on November 6, 2014, Ms. Johnson, accompanied by Mr. Roy, went to her mother's house and the defendant, who was outside her mother's house, began screaming and threatening to kill both Ms. Johnson and Mr. Roy. The defendant then followed Ms. Johnson and Mr. Roy a portion of the way to the Fifth District Police Station where, frightened that the defendant intended to carry out his threats, Ms. Johnson filed a complaint. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that the defendant violated the protective order in contacting Ms. Johnson's mother, in confronting her verbally when she arrived at her mother's house, and in following Ms. Johnson and Mr. Roy a part of the way to the police station.
Count 5
This conviction for violation of the protective order on October 18, 2014, is apparently based on Ms. Johnson's discovery of a damaged window in her home and her attribution of the damage to the defendant. There are no witnesses to the window being damaged or to the defendant being in the vicinity of Ms. Johnson's home on October 18, 2014, nor is there direct or circumstantial evidence connecting the defendant to the damaged window or supporting Ms. Johnson's belief that the damage was done by the defendant. Accordingly, even viewed in the light most favorable to the prosecution, a rational trier of fact could not find beyond a reasonable doubt that the defendant *41 violated the protective order on this date. The evidence is insufficient to support this conviction.
Count 6
This conviction is based on the purported burglary of the automobile belonging to Ms. Johnson's son while parked overnight in front of Ms. Johnson's house which was discovered on November 18, 2014. Mr. Williams (Ms. Johnson's son) testified, however, that he discovered the burglary of his laptop from his car January 2015, the same date he discovered the defendant's name and initials carved into the paint finish. There are no witnesses to the car burglary or to the defendant being in the vicinity of Ms. Johnson's home on November 18, 2014, nor any other direct or circumstantial evidence connecting the defendant to the missing laptop. Accordingly, even viewed in the light most favorable to the prosecution, a rational trier of fact could not find beyond a reasonable doubt that the defendant violated the protective order on this date. There is not sufficient evidence to support this conviction.
Count 7
This conviction is based on the shattered window of Mr. Roy's vehicle which occurred on Thanksgiving, November 27, 2014, while parked outside Ms. Johnson's home. Given the antagonistic relationship between the parties and other confrontations that offered in November 2014, the attribution of the damage to the defendant by Ms. Johnson and Mr. Roy is not unreasonable. Nonetheless, in the absence of any direct or circumstantial evidence linking the defendant to the Thanksgiving incident, even viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not find beyond a reasonable doubt that the defendant was responsible for the damage and, thus, violated the protective order on this date. There is not sufficient evidence to support this conviction.
Count 8
This conviction is based on the incident that occurred on January 17, 2015, wherein the defendant's initials (G.S.) and name (G. Smith) were carved into the vehicle belonging to Ms. Johnson's son. Ms. Johnson testified that she recognized the defendant's handwriting in the carved initials and name. Photographs of the damage were submitted into evidence. While the plausibility of someone's handwriting being recognizable from graffiti carved in the paint finish of an automobile is problematic, no evidence (such as a handwriting sample) was introduced to refute the identification. However, it is not this court's function to assess credibility or reweigh the evidence. Accordingly, viewed in the light most favorable to the prosecution, a rational trier of fact could find it credible that Ms. Johnson recognized the defendant's name and initials as being carved by the defendant himself and, thereby, find beyond a reasonable doubt that the defendant inflicted the damage, thereby violating the protective order on this date.
Conclusion
After review of the record in light of the applicable law and arguments of the parties, we find that sufficient evidence supports the defendant's convictions on Counts 2, 3, 4, 10, 11, and 12 but that the evidence is insufficient to support the defendant's convictions on Counts 5, 6, and 7.
Assignment of Error 2
The defendant contends the trial court erred in allowing the State to provide evidence of other crimes, i.e. , the protective order, because La. Code Evid. art. 412.4 was enacted after the bill of information was filed in this case and the notice *42 of intent filed by the State on the morning of trial did not constitute a reasonable notice.
Applicable Law
La. Code Evid. art. 412.4 provides:
A. When an accused is charged with a crime involving abusive behavior against a family member, household member, or dating partner or with acts which constitute cruelty involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving assaultive behavior against a family member, household member, or dating partner or acts which constitute cruelty involving a victim who was under the age of seventeen at the time of the offense, may be admissible and may be considered for its bearing on any matter to which it is relevant, subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
C. This Article shall not be construed to limit the admissibility or consideration of evidence under any other rule.
D. For purposes of this Article:
(1) "Abusive behavior" means any behavior of the offender involving the use or threatened use of force against the person or property of a family member, household member, or dating partner of the alleged offender.
(2) "Dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.
(3) "Family member" means spouses, former spouses, parents and children, stepparents, stepchildren, foster parents, and foster children.
(4) "Household member" means any person having reached the age of majority presently or formerly living in the same residence with the offender as a spouse, whether married or not, or any child presently or formerly living in the same residence with the offender, or any child of the offender regardless of where the child resides.
In State v. Goza , 408 So.2d 1349, 1352-53 (La. 1982) (internal citations omitted), the Louisiana Supreme Court stated:
The only exception to the requirement of notice of intent to use other crimes evidence is as to evidence of offenses which are part of the res gestae , or convictions used to impeach defendant's testimony. The reason no notice is required as to res gestae evidence is that for evidence of the other crime to so qualify, the other crime must be so closely connected that the indictment or information as to the instant crime is deemed to carry with it notice as to the other crimes as well. No additional notice requirement is deemed necessary as to convictions offered for the purpose of impeaching the credibility of a defendant because of the other "zealously placed safeguards" surrounding its introduction.
Analysis
In this case, the State filed its notice of intent to offer evidence of a previous crime pursuant to La. Code Evid. art. 412 on *43 January 9, 2017, the morning of trial. However, on January 6, 2017, the State filed its notice of intent to offer res gestae evidence or, in the alternative, evidence of defendant's other crimes, wrongs, or acts under La. Code Evid. art. 404(B)(1) seeking to present the identical evidence. Specifically, the prior act evidence the State sought to introduce related to the circumstances leading up to the issuance of the protective order on October 8, 2014, by the Plaquemines Parish 24th Judicial District Court. In Count 1 of the bill of information the defendant was charged with stalking a person under a protective order, a violation of La. Rev. Stat. 14:40.2, and, accordingly, the existence of the protective order issued on October 8, 2014, is an essential element of the crime charged. The trial court ruled that La. Code Evid. art. 412.4 was applicable, that no hearing was required, and that defendant had received adequate notice. The State presented evidence of the September 2014 domestic battery committed by the defendant against his former girlfriend, Ms. Johnson, and the resulting protective order issued in Plaquemines Parish against the defendant in October of 2014.
The defendant's violation of that protective order by repeatedly harassing Ms. Johnson, Mr. Roy, and other members of Ms. Johnson's family resulted in the fifteen counts of violation of a protective order. Thus, the 2014 Plaquemines Parish domestic battery and resulting protective order form part of the res gestae of the offenses of violation of a protective order. Moreover, focusing on the date of the filing of the Prieur notice, the defendant had three days' notice prior to the trial date of the State's intent to use this evidence. In addition, the defendant's arrest for the prior domestic assault and the resulting protective order form the underlying basis of the violation of a protective order counts against him. The defendant was undoubtedly aware of the allegations against him relating to the prior domestic assault. Certainly, the defendant was not surprised by the State's intent to introduce the 2014 Plaquemines Parish domestic assault and resulting protective order in order to prove that the defendant repeatedly violated the protective order.
Notably, with regard to the defendant's argument that La. Code Evid. art. 412.4 is inapplicable because it was deemed effective August 1, 2016, subsequent to the dates the of the crimes charged, the defendant does not contest that evidence of the Plaquemines Parish domestic battery is admissible under Article 412.4. Instead, defendant contests only its applicability under Article 412.4.
In State v. Willis , 2005-218 (La. App. 3 Cir. 11/2/05), 915 So.2d 365, the Louisiana Third Circuit Court of Appeal addressed the issue of whether a trial court's retroactive application of La. C.E. art. 412.2, violated the ex post facto clause. While not controlling, the reasoning of the court in Willis , is informative. At the time of trial in Willis , La. Code Evid. art. 412.2 provided in part as follows:
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
The Court in Willis stated:
The retroactive application of Article 412.2 to the Defendant's case did not constitute an ex post facto violation. Article 412.2 did not alter the amount of proof required in the Defendant's case as it merely pertains to the type of evidence which may be introduced. Prior to the enactment of Article 412.2, the testimony at issue was admissible if it *44 fell within an exception under La. Code Evid. art. 404(B). Article 412.2 merely removed that restriction.
Willis , 2005-218, p. 22, 915 So.2d at 383. Notably, La. Code Evid. art. 412.2(B) at issue in the Willis case and La. Code Evid. art. 412.4(B) at issue in this case contain identical language. Accordingly, we do not find that the trial court abused its discretion in finding the facts surrounding the issuance of the October 8, 2014, protective order by the Plaquemines Parish 25th Judicial District Court were admissible. This assignment of error is without merit.
Assignment of Error 3
Finally, the defendant contends the convictions obtained for violation of La. Rev. Stat. 14:79, violation of the protective order, and La. Rev. Stat. 14:40.2, stalking against a person for whose benefit a protective order was issued, violate the prohibition against double jeopardy. The defendant argues that the "Same Evidence Test" dictates he should not have been charged with violations of a protective order and stalking a person for whose benefit a protective order was issued because the same evidence was used to convict him of both crimes. However, the Louisiana Supreme Court recently held that the application of the "same evidence test" is no longer required in Louisiana stating: "[W]e take this opportunity to make clear that the protections against double jeopardy mandated by the federal constitution, as restated in this state's constitution, fall within the analytical framework set forth in Blockberger [v. United States , 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ] and Louisiana courts need only apply that framework in analyzing questions of double jeopardy." State v. Frank , 2016-1160, p. 6 (La. 10/18/17), 234 So.3d 27, 2017 WL 4681941.
Moreover, in State v. Cain , 324 So.2d 830, 832 (La.1975), the Louisiana Supreme Court, citing Blockberger , found if one offense requires proof of additional facts which the other does not, the accused may be tried and convicted on both offenses. In this case, violation of a protective order and stalking are two distinct offenses. Each offense includes an element not included in the other. Violating a protective order requires proof of a protective order, but stalking does not; and stalking requires proof that defendant engaged in certain prohibited behaviors on more than one occasion, whereas violating a protective order may be proven with only one instance of misbehavior. Accordingly, the defendant's argument that his conviction on both stalking and violating a protective order violates the Double Jeopardy Clause is without merit.
Conclusion
For the above stated reasons, we affirm the defendant's convictions as to Counts 1-4 and 10-12, but reverse the defendant's convictions as to Counts 5-7. Concomitantly, the defendant's sentences for Counts 1-4 and 10-12 are affirmed; the defendant's sentences for Counts 5-7 are vacated.
AFFIRMED IN PART; REVERSED IN PART.

While there is no minute entry or statement by the trial court, it appears the trial of the fifteen counts of the violations of the protective order was conducted by the trial court simultaneously with the jury trial of the stalking offence.

A review of the record reveals no errors patent.

The date of Thanksgiving in 2014.

Mr. Williams first name is spelled "Jody" in the trial transcript.