**STATE OF LOUISIANA IN
THE INTEREST OF J.K.**

         **\***

         **\***

         **\***

         **\***

         **NO. 2022-CA-0308**

         **COURT OF APPEAL**

         **FOURTH CIRCUIT**

         **STATE OF LOUISIANA**

**\* \* \* \* \* \* \***

APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2022-010-01-DQ-C, SECTION "C"
Honorable Candice Bates Anderson, Judge
**\* \* \* \* \* \***
**Judge Paula A. Brown**
**\* \* \* \* \* \***

(Court composed of Judge Rosemary Ledet, Judge Paula A. Brown, Judge Tiffany
Gautier Chase)

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

    COUNSEL FOR DEFENDANT/APPELLANT

Jason Rogers Williams
District Attorney
G. Benjamin Cohen
Chief of Appeals
Victoria J. Cvitanovic
Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 S. White Street
New Orleans, LA 70119

    COUNSEL FOR STATE/APPELLEE

**AFFIRMED
JULY 13, 2022**

This is a juvenile delinquency appeal. The juvenile, J.K.,[1] was adjudicated delinquent on one count of aggravated second degree battery, two counts of armed robbery, one count of unauthorized use of a motor vehicle and one count of attempted second degree murder. The juvenile court imposed a disposition of juvenile life for aggravated battery, both counts of armed robbery and attempted second degree murder, and a two-year disposition was imposed for the unauthorized use of a motor vehicle. J.K. appealed. For the reasons that follow, we affirm J.K.'s delinquency and disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 27, 2022, the State filed a delinquency petition (the "Petition") in the Juvenile Court for the Parish of Orleans, charging J.K. and three other juveniles, R.B., D.D. and K.C., for engaging in a crime spree that spanned from

---

[1] In accordance with the Louisiana Uniform Rules, Courts of Appeal, Rules 5-1 and 5-2, initials are used throughout this opinion to protect the juvenile's identity. *See e.g., State in Interest of K.D.*, 2013-1274, p. 1, n. 1 (La. App. 4 Cir. 4/9/14), 140 So.3d 182, 183.

1

January 3 to January 7, 2022.  In the Petition, the State alleged J.K. committed the following crimes[2] against Victims Ms. Mantle, Mr. Crafton, Mr. Rumsey and Mr. Estrella:

> COUNT 2: LA. R.S. 14:34.7 relative to AGGRAVATED SECOND DEGREE BATTERY, to wit: a battery against [Ms. Mantle] committed with a dangerous weapon when the offender intentionally inflicts great bodily harm, on January 6, 2022 at approximately 8:00 P.M. at the 2400 block of Jena Street, in the Parish of Orleans;
>
> COUNT 3: LA R.S. 14:64 relative to ARMED ROBBERY, to wit: taking gray Lexus keys and cellphone in the possession of [Mr. Crafton], from the victim's person or in his/her immediate control, by use of force or intimidation, while armed with a firearm, a dangerous weapon, on January 6, 2022, at approximately 8:00 P.M. at the 5900 block of Constance Street, in the Parish of Orleans;
>
> COUNT 4: LA R.S. 14:68.4 relative to UNAUTHORIZED USE OF A MOTOR VEHICLE, to wit: the intentional taking or use of a gray 2015 Jeep Grand Cherokee belonging to [Mr. Rumsey], either without the owner's consent or by means of fraudulent practice or representations, but without any intent to permanently deprive, between January 6, 2022 at 7:30 P.M. and January 7, 2022 at 9:30 A.M. on or around the 2400 block of Jena Street, the 5900 block of Constance Street and/or the 3400 block of Pauger Street, in the Parish of Orleans; and
>
> COUNT 7: LA R.S. 14:64 relative to ARMED ROBBERY, to wit: taking of black Infinity in the possession of [Mr. Estrella], from the victim's person or in his/her immediate control, by use of force or intimidation, while armed with a firearm, a dangerous weapon, on January 3, 2022, at approximately 8:00 P.M. at the 2200 block of Frenchmen Street, in the Parish of Orleans.

On March 24, 2022, the State filed an amended petition, which charged J.K. with an additional crime:

---

[2] The State also alleged additional charges in the Petition stemming from the crime spree that were not applicable to J.K.: COUNT 1 relative to the attempted killing of [Ms. Mantle] while the perpetrator was engaged in the attempted armed robbery of [Ms. Mantle's] vehicle, a violation of 14:(24)(27)30.1; COUNT 5 relative to the intentional possession of a handgun on January 7, 2022, when the offender has not yet attained the age of 18, a violation of La. R.S. 14:95.8; and, COUNT 6 relative to the intentional concealment of a firearm on one's person on January 7, 2022, a violation of 14:95(A).

COUNT 8: LA R.S. 14: (27) 30.1 relative to ATTEMPTED SECOND DEGREE MURDER, to wit: attempted killing of [Ms. Mantle] where there was a specific intent to kill or inflict great bodily harm and while the perpetrator was engaged in the attempted armed robbery of a white Mercedes Benz car in the possession of [Ms. Mantle], on January 6, 2022, at approximately 8:00 p.m. at the 2400 block of Jena Street, in the Parish of Orleans.

J.K. entered a plea of not guilty on all counts.

On March 25, 2022, the adjudication hearing commenced.[3] The State called nine witnesses to testify – four of whom were the victims – and offered, filed and introduced twenty-four exhibits into evidence. J.K. did not call any witnesses or introduce any exhibits into evidence in presenting her defense.

*Adjudication Hearing Testimony*

*Victim 1*

Mr. Rumsey testified that on December 26, 2021, he and his wife were loading their 2015 grey Jeep Cherokee (the "Jeep") with their son's toys and stroller. After he returned outside to finish loading his vehicle, he noticed that his Jeep was gone. He believed the key fob for the Jeep had fallen somewhere inside the vehicle. While Mr. Rumsey acknowledged that he reported his Jeep stolen, he testified that he did not know which perpetrator stole his vehicle. Mr. Rumsey was also unable to make an in-court identification of J.K. but testified that he had not given anyone, including J.K., consent to occupy his vehicle.[4]

*Victim 2*

Mr. Estrella, a Lyft driver on the day of the crime, testified that on January 3, 2022, he picked up five individuals – two females and three males – in his black

---

[3] Juveniles J.K. and R.B. were tried together.
[4] The State did not charge J.K. or any of her alleged accomplices with the December 26, 2021 theft of Mr. Rumsey's Jeep.

Infiniti SUV from the Aloft Hotel near the French Quarter (the "Hotel"). As he was nearing their destination on Frenchmen Street, one of five individuals instructed him to turn left down an unknown street to drop off one of the passengers before continuing to their designated stop. Mr. Estrella complied. After he was halfway down the street, one of the passengers in the backseat put a gun to Mr. Estrella's head and told him not to move or they were "going to blast [him] right there!" According to Mr. Estrella, the perpetrators forced him out of his vehicle, searched him and made him pull down his pants. Following, they stole his wallet, cellphone and vehicle, and left him stranded on the dark street. Mr. Estrella reported the crime to the NOPD. His cellphone was his only possession recovered by the police.[5]

Detective Katherine Barker ("Det. Barker") testified that she was the lead investigator for the armed carjacking involving Mr. Estrella on January 3, 2022. As part of her investigation, Det. Barker collected video surveillance from the Hotel (the "Hotel footage"). Det. Baker testified that the Hotel footage depicted five individuals in the Hotel lobby; the same five individuals were seen loitering outside of the Hotel.[6] Det. Barker confirmed that one of the individuals was average body build wearing a New York Yankees baseball cap and Nike flip flops. According to Det. Baker, she also collected video surveillance footage from the corner of Baronne and Gravier Streets (the "Baronne and Gravier Streets footage), which showed the same five individuals from the Hotel footage, including a female

---

[5] Mr. Estrella's vehicle was not recovered at the time of the adjudication hearing.
[6] The State offered, filed and introduced into evidence the Hotel footage.

of average body build wearing a New York Yankees baseball cap and Nike flip flops.[7]

Det. Barker noted that all the video surveillance footage she collected was consistent with Mr. Estrella's description of the five individuals he picked up at the Hotel. Because Mr. Estrella's "Find My iPhone" app was activated, Det. Barker recovered Mr. Estrella's cellphone within an hour of the robbery and completed a latent fingerprint test, which revealed J.K.'s identity. Upon receipt of the latent fingerprint report, Det. Barker issued a warrant for J.K's arrest.

*Victim 3*

Mr. Crafton testified that on the evening of January 6, 2022, at approximately 7:30 p.m., he was sitting in his black Lexus while parked in the 5900 block of Constance Street when an SUV, later identified as Mr. Rumsey's Jeep, drove up and parked next to his vehicle.[8] Two females, one wearing a grey sweatshirt and shorts, exited the Jeep and surrounded Mr. Crafton's vehicle. Mr. Crafton said that he immediately exited his vehicle, at which time the female perpetrators placed a gun to his head and stomach and demanded his possessions. After begging for his life, Mr. Crafton said he surrendered his cellphone and keys to the two females. He then hid behind a gate, waiting for the female perpetrators to leave in his vehicle. Mr. Crafton relayed that after the females failed to start his vehicle, a male exited the Jeep and attempted to start Mr. Crafton's vehicle, but was also unable to do so. The three perpetrators ran back to the Jeep and drove

---

[7] The State offered, filed and introduced into evidence the Baronne and Gravier Streets footage.
[8] Although Mr. Crafton testified the vehicle that pulled alongside him was an SUV, the surveillance footage presented by the State revealed that the SUV was actually a Jeep. For clarity, we will refer to the SUV as the Jeep throughout Mr. Crafton's testimony.

away. Mr. Crafton inspected his vehicle and found a pair of Nike flip flops on the floorboard, which did not belong to him, and reported the crime to the NOPD.

Officer Jack Wilson ("Ofc. Wilson") with the NOPD testified that he was involved in the investigation of the armed robbery of Mr. Crafton. As a part of carrying out his investigation, Ofc. Wilson canvassed the area where the crime occurred and secured video footage of Constance Street (the "Constance Street footage"), and a pair of Nike flip flops left on the floorboard inside Mr. Crafton's vehicle along with Mr. Crafton's vehicle keys.

Detective Timothy Jones ("Det. T. Jones") testified that he also investigated Mr. Crafton's armed robbery, and reviewed the Constance Street footage that captured the crime. Det. T. Jones confirmed the Constance Street footage showed the perpetrators arriving and leaving in Mr. Rumsey's grey Jeep.[9] The Constance Street footage also depicted two females inside Mr. Crafton's vehicle – one wearing a grey hooded sweatshirt and shorts. Shortly afterwards, a male exited the Jeep, entered Mr. Crafton's vehicle and attempted to start it.

*Victim 4*

Ms. Mantle testified that on the evening of January 6, 2022, she was sitting in her vehicle with the doors locked waiting for her takeout dinner at a restaurant on Freret and Jena Streets, when two females approached her car. She said that as one of the individuals knocked on her driver window with a gun brandished in her right hand, the other individual was simultaneously trying to open the passenger door. Ms. Mantle panicked and shifted her car into drive, then "floored" the gas pedal and sped away. The two females fired gunshots into her vehicle as she fled

---

[9] The State offered, filed and introduced into evidence the Constance Street footage.

away. One of the bullets grazed her arm and another bullet penetrated the driver's seat headrest.[10]

Ms. Mantle drove her vehicle to St. Charles Avenue – where a parade was rolling – jumped out of the vehicle and ran to the neutral ground seeking help from the first family she saw. The family rendering aid to Ms. Mantle called 911. The paramedics concluded that Ms. Mantle sustained a gunshot wound to her right triceps and a large contusion injury to the right side of her abdomen. Ballistics evidence revealed two separate firearms were used in the shooting.

Det. T. Jones testified that he was investigating the incident that occurred on January 6, 2022 with Ms. Mantle. In carrying out his investigation, Det. T. Jones reviewed surveillance video footage of Jena Street (the "Jena Street footage") near the shooting of Ms. Mantle's vehicle. According to Det. T. Jones, the perpetrator, having lost her Nike flip flops in the prior armed robbery of Mr. Crafton, was seen approaching Ms. Mantle's vehicle in black socks with a firearm.[11] After investigating further and noticing that the Jeep was in both the Constance and Jena Streets footage, Det. T. Jones believed that the same perpetrators were involved in committing both crimes. Because the Jeep has previously been reported stolen, Det. T. Jones attempted to track its location by Sirius XM radio technology. However, an officer notified Det. T. Jones that the Jeep was seen near an apartment, surrounded by four individuals. Thereafter, the Jeep was recovered on Pauger Street nearby Richard's Food Store ("Richard's").

Detective David Jones ("Det. D. Jones") testified that on the morning of January 7, 2022, he was dispatched to assist a few NOPD detectives with a

___

[10] The State offered, filed and introduce into evidence photos that depicted bullet holes in the glovebox and driver's seat headrest, along with three shattered windows of Ms. Mantle's vehicle.
[11] The State offered, filed and introduced into evidence the Jena Street footage.

surveillance operation at Richard's located on the corner of Allen and Rocheblave Streets. As J.K. was a person of interest in the crime spree, she was arrested. According to Det. D. Jones, R.B., who was also arrested with J.K, was illegally carrying a concealed firearm at the time of his arrest and had Mr. Rumsey's Jeep keys hooked onto his pants.[12] Det. D. Jones confirmed that J.K. was arrested wearing the same New York Yankees baseball cap, grey hooded sweatshirt and shorts as seen in the Hotel, Jena and Constance Streets footages.

At the conclusion of the hearing, on March 28, 2022, the juvenile court rendered its judgment, adjudicating J.K. delinquent on all the charges. J.K. waived all sentencing delays. Following, the juvenile court imposed a disposition of juvenile life for one count of aggravated battery, juvenile life for each count of armed robbery, two years for the unauthorized use of a motor vehicle and juvenile life for attempted second degree murder. J.K.'s dispositions are to run concurrently.

This timely juvenile delinquency appeal followed.

### ERRORS PATENT

This Court routinely reviews the face of the record in juvenile delinquency appeals for potential errors patent. *State in Interest of J.P.*, 2019-0542, p. 2 (La. App. 4 Cir. 9/25/19), 280 So.3d 245, 247-48 (citing *State ex rel. A.H.*, 2010-1673, p. 9 (La. App. 4 Cir. 4/20/11), 65 So.3d 679, 685) (wherein this Court set forth that pursuant to La. Ch.C. art. 104 and La. C.Cr.P. art. 920, "conducting an error patent review in juvenile delinquency proceedings is warranted"). A review of the face of the record reveals one error patent, J.K.'s double jeopardy challenge, which will be

---

[12] While Det. Jones was at NOPD's central evidence and property cages, where vehicles are stored, he verified that the Jeep keys seized from R.B. accessed Mr. Rumsey's Jeep.

more fully discussed, *infra*, as J.K. assigns this error patent as her first assignment of error.[13]

**DISCUSSION**

J.K. asserts three assignments of error. First, J.K argues that her charges and convictions of aggravated second degree battery and attempted second degree murder involving the same incident and same victim violates the double jeopardy clause of her Fifth Amendment right. Second, J.K. contends the State's evidence was insufficient to prove J.K.'s guilt beyond a reasonable doubt. Third, J.K argues that the juvenile court's imposition of the most severe and excessive disposition was an excessive, cruel and unusual punishment. We will first address the sufficiency of the State's evidence as it relates to each count.

**Assignment of Error 2: Sufficiency of the Evidence**

J.K. contends that the State failed to negate the possibility of her misidentification as a perpetrator of the charges. J.K. argues that, as to all the charges, the State's wholly circumstantial evidence does not satisfy the beyond a reasonable doubt standard, nor does it negate a reasonable hypothesis of innocence. J.K. further argues that as to count three, the charge of armed robbery, the State failed to produce sufficient evidence to prove beyond a reasonable doubt that something was taken – a necessary element to prove armed robbery.

It is well-settled that "[w]hen reviewing the sufficiency of the evidence in juvenile cases, the standard of review is whether, viewing all of the evidence in a light most favorable to the prosecution, the juvenile court committed manifest error in finding beyond a reasonable doubt that the juvenile committed a

---

[13] *See, e.g., State v. Gibson*, 2003-0647, p. 7 (La. App. 4 Cir. 2/4/04), 867 So.2d 793, 798 (wherein this Court found that a double jeopardy challenge raised for the first time on appeal as an assignment of error, is an error patent).

delinquent act." *State in Interest of C.R.*, 2019-0917, p. 5 (La. App. 4 Cir. 1/29/20), 290 So.3d 220, 223 (citation omitted). Review requires the appellate court to "determine that the evidence was sufficient to convince a rational trier of fact 'that all of the elements of the crime had been proved beyond a reasonable doubt.'" *Id.* at p. 6, 290 So.3d at 223 (citing *State v. Neal*, 2000-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657) (citation omitted). In order to adjudicate a juvenile delinquent, the State must prove the identity of the perpetrator and each element of the offense. *State in Int. of A.P.*, 2020-0623, p. 8 (La. App. 4 Cir. 4/21/21), 317 So.3d 887, 892.

"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. A reasonable hypothesis of innocence must sufficiently lead a rational fact finder to entertain a reasonable doubt about guilt. *See State v. Sutton,* 436 So.2d 471, 475 (La. 1983). Recently, this Court in *State v. Gilliam*, 2021-0506, p. 13 (La. App. 4 Cir. 3/10/22), 336 So. 3d 513, 523, *writ denied,* 2022-00537 (La. 6/8/22), and *writ denied,* 2022-00601 (La. 6/8/22) (citing *State v. Lee*, 01-1080, p. 12 (La. 11/28/01), 800 So.2d 833, 841) set forth:

> [R]elying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt. (internal citations omitted).

Accordingly, "[i]t is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Dukes*, 2019-0172, p. 8 (La. App. 4 Cir. 10/2/19), 281 So.3d 745, 752 (citing *State v. McGhee*, 2015-2140, p. 2 (La. 6/29/17), 223 So.3d 1136, 1137) (citation omitted). "Credibility

determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact." *Id.* (citing *State v. Brumfield*, 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316).

*COUNT 2: Aggravated Second Degree Battery of Ms. Mantle*

"Aggravated second degree battery is a battery committed with a dangerous weapon when the offender intentionally inflicts seriously bodily injury." La. R.S. 14:34.7. For a delinquency of aggravated second degree battery, the State must prove: "1) the intentional use of force or violence upon the person of another, 2) using a dangerous weapon, 3) without the consent of the victim, and 4) when the offender has the specific intent to inflict serious bodily injury." *State v. Clanton*, 2019-0316, p. 6 (La. App. 4 Cir. 11/6/19), 285 So.3d 31, 36 (citing La. R.S. 14:34.7). Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1).

The State's evidence presented on this charge shows that on January 6, 2022, Ms. Mantle suffered serious bodily injury when two female perpetrators intentionally fired gunshots at her, striking her in her right triceps, with the intent to commit great bodily harm, as she attempted to flee the crime scene. Ms. Mantle had been sitting in her vehicle on Jena Street with her doors locked when one of the perpetrators brandished a firearm, while the other attempted to open the passenger side of her vehicle. Review of the Jena Street footage depicted J.K., with a firearm, wearing black socks, a grey hooded sweatshirt and shorts – the same clothing she was arrested in the following day. Thus, we conclude the State's uncontroverted evidence was reasonably sufficient to identify J.K. as the

11

offender and adjudicate J.K. delinquent beyond a reasonable doubt of aggravated second degree battery.

*COUNT 3: Armed Robbery of Mr. Crafton*

"The elements of armed robbery are: (1) the taking, (2) of anything of value belonging to another, (3) from the person of another or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon." *State ex rel. C.J.*, 2010-1350, p. 7 (La. App. 4 Cir. 2/9/11), 60 So.3d 46, 51 (citation omitted). "The State bears the burden of proving the elements of the charged offense, as well as the identity of the defendant as the perpetrator." *State in Int. of T. B.*, 2020-0929, p. 8 (La. App. 1 Cir. 2/19/21), 320 So.3d 1143, 1150.

On this charge, the State's evidence reflects that on January 6, 2022, two armed female perpetrators approached Mr. Crafton and placed a firearm to his head and stomach in an attempt to steal his vehicle. The evidence further reveals that Mr. Crafton surrendered his cellphone and keys to the female perpetrators. J.K. suggests that because Mr. Crafton's keys were left in the vehicle and the police later found his cellphone near the crime scene, there was not an armed robbery. Rather, J.K. argues that the crime, at best, was an attempted armed robbery as nothing was actually "taken" from Mr. Crafton. We disagree.

Our review of the Constance Street footage clearly depicts J.K. forcefully pointing a firearm at Mr. Crafton and taking the cellphone and keys Mr. Crafton tossed to her. Mr. Crafton, then, hid and waited for the perpetrators to leave in his vehicle. Ofc. Wilson as a part of his investigation canvassed the area and secured the Constance Street footage, the keys to the vehicle and the Nike flip flops left on the floorboard of Mr. Crafton's vehicle. There is no evidence to suggest that Mr. Crafton's cellphone was recovered from the crime scene. Notwithstanding, the

12

fact that J.K. was not able to start Mr. Crafton's vehicle or that she did not take Mr. Crafton's keys with her as she left the crime scene, does not negate the uncontroverted evidence that J.K. took something of value from Mr. Crafton by use of force with a deadly weapon. J.K. was identified as one of the female perpetrators by what she was wearing, a New York Yankees baseball cap, a grey hooded sweatshirt and shorts – the same clothing she was wearing in her arrest the following day. Moreover, the Nike flip flops J.K. was seen wearing in the Hotel footage were left behind in Mr. Crafton's vehicle. Accordingly, we conclude the State's uncontroverted evidence was reasonably sufficient to identify J.K. as the offender and adjudicate J.K. delinquent beyond a reasonable doubt of armed robbery of Mr. Crafton.

*COUNT 4: Unauthorized Use of a Motor Vehicle*

J.K. was charged with the unauthorized use of a motor vehicle for using Mr. Rumsey's Jeep in the commission of an armed robbery against Mr. Crafton and Ms. Mantle, a violation of La. R.S. 14:68.4. The "[u]nauthorized use of a motor vehicle is the intentional taking or use of a motor vehicle, which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the motor vehicle permanently." La. R.S. 14:68.4; s*ee also State ex rel. C.B.*, 2009-1114, p. 5 (La. App. 4 Cir. 12/16/09), 28 So.3d 525, 527 (citing La. R.S. 14:68.4(A)). "The Louisiana Supreme Court has expressly construed unauthorized use of a movable as 'requiring a showing of *mens rea* or criminal intent . . . .'" *State ex rel. T.C.*, 2009-1669, p. 4 (La. App. 4 Cir. 2/16/11), 60 So. 3d 1260, 1262 (citing *State v. Bias*, 400 So.2d 650, 652-53 (La. 1981)). As such, it is sufficient that the State prove a vehicle was knowingly used without the consent of the owner

to establish the element of criminal intent. *See State in Int. of C.T.*, 2016-0939, p. 3, n. 3 (La. 10/18/17), 236 So.3d 1210, 1212.

The evidence presented here reflects that on December 26, 2021, Mr. Rumsey's Jeep was taken without his permission, and he reported it stolen. The State's evidence further reflects that J.K. and her cohorts used Mr. Rumsey's vehicle in the commission of the crimes, which indicates J.K. possessed the criminal intent to knowingly occupy Mr. Rumsey's vehicle without his consent. Mr. Crafton testified that on January 6, 2022, just before he was robbed at gunpoint, two female perpetrators exited the Jeep and then left in the Jeep when they could not start his vehicle. The Constance Street footage corroborated Mr. Crafton's testimony. In addition, review of the Jena Street footage depicts J.K. exiting and entering Mr. Rumsey's Jeep just before and immediately after firing gunshots at Ms. Mantle. Moreover, when J.K. was arrested with R.B., R.B. had the Jeep key fob hooked onto his pants at the time of their arrest. Based on the evidence, we conclude the State's uncontroverted evidence was reasonably sufficient to identify J.K. as the offender and adjudicate J.K. delinquent beyond a reasonable doubt of unauthorized use of Mr. Rumsey's Jeep.

## COUNT 7: Armed Robbery of Mr. Estrella

The State's evidence on this charge reveals that on January 3, 2022, Mr. Estrella picked up five individuals, including J.K., from the Hotel for a Lyft ride. The individuals threatened Mr. Estrella by gunpoint and stole his car keys, car, cellphone and wallet. The State's uncontroverted evidence further shows that after Mr. Estrella's cellphone was found near the crime scene within an hour of the incident, a latent fingerprint test of the cellphone was a conclusive match to J.K. Thus, we conclude the State's uncontroverted evidence was reasonably sufficient

14

to identify J.K. as the offender and adjudicate J.K. delinquent beyond a reasonable doubt of the armed robbery against Mr. Estrella.

<u>COUNT 8: *Attempted Second Degree Murder*</u>

Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. *See* La. R.S. 14:30.1(A)(1). Thus, for a delinquency finding of the attempted second degree murder, the State must prove beyond a reasonable doubt that the perpetrator:

> (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Huizar,* 414 So.2d 741 (La. 1982). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.

*State ex rel. G.B.*, 2007-1577, p. 4 (La. App. 4 Cir. 5/14/08), 985 So.2d 828, 830 (quoting *State v. Bishop*, 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437) (citations omitted). "The overt act need not be the ultimate step toward or the last possible act in the consummation of the crime attempted, and it is the intent to commit the crime, not the possibility of success that determines whether the act or omission constitutes the crime of attempt." *Dukes*, 2019-0172, p. 12, 281 So.3d at 755 (citation omitted).

The State's evidence shows that J.K. attempted to kill Ms. Mantle on January 6, 2022. J.K. possessed the specific intent to kill when J.K. aimed her firearm at Ms. Mantle while she was fleeing away in her vehicle, and J.K. completed an overt act tending toward the accomplishment of Ms. Mantle's death when J.K. pulled the firearm's trigger. Det. T. Jones testified that J.K., wearing black socks (having left her Nike flip flops in Mr. Crafton's vehicle from the prior

15

offense), a grey hooded sweatshirt and shorts, was seen in the Jena Street footage committing the offense against Ms. Mantle. In their attempt to kill Ms. Mantle, J.K. and her accomplice fired multiple gunshots at Ms. Mantle, striking her driver seat headrest, glovebox and windows. Ms. Mantle sustained serious bodily injuries to her right arm and right abdomen. Additionally, the State's ballistics evidence reflects that two separate firearms were used in the attempt to kill Ms. Mantle. Based on the foregoing, we conclude the State's uncontroverted evidence was reasonably sufficient to identify J.K. as the offender and adjudicate J.K. delinquent beyond a reasonable doubt of attempted second degree murder of Ms. Mantle.

In sum, we conclude the State negated the possibility of misidentification of J.K. as the perpetrator of the charges. In negating a reasonable hypothesis of innocence, J.K. was seen in the Hotel, Constance and Jena Streets surveillance footage wearing the same clothing as she was wearing at the time of her arrest – a New York Yankees baseball cap, grey hooded sweatshirt and shorts. The footage also depicts J.K. entering and exiting the Jeep that was used throughout the commission of the crime spree. As such, the juvenile court, as a rational trier of fact, had sufficient evidence to identify J.K. as the offender and adjudicate J.K. delinquent of all the charges. Accordingly, this assignment of error lacks merit.

**Assignment of Error 1: Double Jeopardy**

J.K. argues that because count two, aggravated second degree battery, is a responsive verdict to count eight, attempted second degree murder, and involves the same evidence, victims, actions and incident, the double jeopardy clause of the Fifth Amendment to the United States Constitution precludes charging and adjudicating her delinquent of both counts. We disagree.

16

The double jeopardy clause of the Fifth Amendment to the United States Constitution protects persons "against a second prosecution for the same offense after acquittal, *Ball v. United States*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), against a second prosecution for the same offense after conviction, *Ex parte Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889), and against multiple punishments for the same offense, *Ex parte Lange*, 85 U.S. 163, 18 Wall. 163, 21 L.Ed. 872 (1873)." *State v. Frank*, 2016-1160, p. 5 (La. 10/18/17), 234 So.3d 27, 30; *see also* La. Const. art. I, § 15.

This Court in *State v. Smith*, 2017-0661, pp. 23-24 (La. App. 4 Cir. 1/10/18), 237 So.3d 29, 44, noted that the application of the "same evidence" test is no longer a requirement, as set forth by the Louisiana Supreme Court. The *Smith* Court explained that "the protections against double jeopardy mandated by the federal constitution, as restated in this state's constitution, fall within the analytical framework set forth in *Blockberger* [*v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)] and Louisiana courts need only apply that framework in analyzing questions of double jeopardy." *Id*. In *Blockberger*, the Supreme Court espoused that "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L. Ed. 306 (1932).

In the case *sub judice*, J.K.'s delinquency of second degree aggravated battery and attempted second degree murder was not a violation of the double jeopardy clause of her Fifth Amendment right. For a delinquency finding of aggravated second degree battery, the State had to prove beyond a reasonable

17

doubt that J.K. had the specific intent to inflict a serious bodily injury with the use of a dangerous weapon against Ms. Mantle.  In contrast, attempted second degree murder required the State to prove beyond a reasonable doubt that J.K. had the specific intent to kill Ms. Mantle.  The intent elements of each offense are distinguishable, and J.K. can be tried and adjudicated delinquent on both offenses. *See, e.g., Smith*, at p. 24, 237 So.3d at 44 (citing *State v. Cain*, 324 So.2d 830, 832 (La. 1975) (wherein the Supreme Court reiterated that "if one offense requires proof of additional facts which the other does not, the accused may be tried and convicted on both offenses").  Moreover, the record reflects that the juvenile court adjudicated J.K. delinquent of aggravated second degree battery.  J.K. is not afforded the protections of the double jeopardy clause of the Fifth Amendment because guilty of aggravated second degree battery is not a responsive verdict to attempted second degree murder. *See* La. C.Cr.P. art. 814(4).[14]  Accordingly, this assignment of error lacks merit.

**Assignment of Error 3: Excessive Disposition**

J.K. argues that her concurrent dispositions of juvenile life as to both counts of armed robbery, juvenile life as to aggravated second degree battery and juvenile life as to attempted second degree murder are excessive and severe.  J.K. contends that the juvenile court judge abused her sentencing discretion by not ordering or relying on a pre-disposition investigation or any mitigating circumstances

This Court in *State in Interest of M.R.*, 2020-0347, p. 7 (La. App. 4 Cir. 10/5/20), 306 So.3d 479, 485 (quoting *State in the Interest of D.M.*, 2002-2528, p.

---

[14] La. C.Cr.P. art. 814(4) provides that the only responsive verdicts for the attempted second degree murder are guilty, guilty of attempted manslaughter, guilty of aggravated battery, guilty of aggravated assault with a firearm, and not guilty.

18

10 (La. App. 4 Cir. 7/2/03), 851 So.2d 1216, 1222) set forth the guidelines for reviewing a juvenile's claim of an excessive disposition:

> In any review for excessiveness, the appellate court must first ascertain whether the lower tribunal took cognizance of the general guidelines provided for juvenile cases in Louisiana Children's Code Article 901, and whether the record reflects an adequate factual basis for the commitment imposed. *State in Interest of T.L.*, 674 So.2d 1122. "Following that determination, the reviewing court need only explore for constitutional excessiveness in light of the circumstances of the case and the background of the juvenile." *Id*. at 1124. "[A]bsent a showing of manifest abuse of the wide discretion afforded in such cases, a disposition will not be set aside as constitutionally excessive." *Id.*

As such, this Court's review of J.K.'s claim of an excessive disposition requires examination for both statutory and constitutional excessiveness. *See Id*.

*Statutory Excessiveness*

The juvenile court's judgment of disposition orders J.K.'s placement in the custody of the Office of Juvenile Justice ("OJJ") until J.K. turns twenty-one years old. La. Ch.C. art. 901(B) provides in pertinent part that "the court should impose the least restrictive disposition authorized by Articles 897 through 900 of [the Louisiana Children's Code] which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society." *See State in Interest of C.H.*, 2021-0516, p. 21 (La. App. 4 Cir. 1/26/22), 335 So.3d 451, 464 (citing *State in Interest of D.T.*, 2019-1284, pp. 7-8 (La. App. 1 Cir. 2/21/20), 2020 WL 862311, *4 (unpub.)). La. Ch.C. art. 901(A) provides that "in considering dispositional options, the court shall not remove a child from the custody of his parents unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal." "Notwithstanding any other provision of law to the contrary, no judgment of disposition shall remain in force for a period exceeding the maximum

term of imprisonment for the felony forming the basis for the adjudication. The court shall give a child credit for time spent in secure detention prior to the imposition of disposition." La. Ch.C. art. 898; *see also* La. Ch.C. art. 900(A).

In the case *sub judice*, had J.K. been charged as an adult, the underlying offense of aggravated second degree battery, La. R.S. 14:34.7(C), carries a maximum statutory punishment of fifteen years; the underlying offense of armed robbery, La. R.S. 14:64(B), carries a statutory punishment of not less than ten years and not more than ninety-nine years; and attempted second degree murder, La R.S. 14: (27) 30.1, carries a maximum statutory punishment of life imprisonment. As J.K. was seventeen years old at the time of her disposition of placement in the custody of OJJ, her overall secure custody is only four years total or until she turns twenty-one, well within the statutory sentencing range for the offenses she committed.

Accordingly, given the guidelines of La. Ch.C. arts. 897 through 900, we conclude J.K.'s concurrent dispositions of juvenile life are not statutorily excessive.

*Constitutional Excessiveness*

J.K. argues that the juvenile court's judgment of disposition is nothing more than needless infliction of pain and suffering. J.K. maintains that the juvenile court failed to cite the mitigating factors used in its judgment of disposition, pursuant to La. Ch.C. art. 901. J.K. further maintains that the juvenile court imposed the most severe sentences without ordering or relying on a pre-disposition investigation.

"A juvenile has the same constitutional right against excessive punishment as an adult." *State in Int. of C.H.*, 2021-0516, pp. 20-21 (La. App. 4 Cir. 1/26/22), 335 So. 3d 451, 463 (citing *State in Interest of N.S.*, 2020-01171, pp. 1-2 (La.

20

12/8/20), 305 So.3d 855, 855-56). "Although a disposition is within the statutory limits, it can be constitutionally excessive if it is 'grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering.'" *State in Interest of M.S.*, 2020-0346, p. 14 (La. App. 4 Cir. 10/5/20), 306 So.3d 487, 497 (citing *State in Interest of R.C.*, 2016-0966, p. 2 (La. App. 4 Cir. 12/28/16), 208 So.3d 962, 964-65) (internal citation omitted). "A sentencing court has 'wide discretion in the imposition of [a] sentence within statutory limits' and a sentence imposed 'should not be set aside as excessive in the absence of a manifest abuse of [its] discretion.'" *State in Interest of M.R.*, at p. 11, 306 So.3d at 487 (quoting *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979)).

La. Ch.C. art. 901(C) pertinently provides:

[C]ommitment of the child to the custody of the Department of Public Safety and Corrections may be appropriate if any of the following exists:

(1) There is an undue risk that during the period of a suspended commitment or probation the child will commit another crime.

(2) The child is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment.

(3) A lesser disposition will deprecate the seriousness of the child's delinquent act.

(4) The delinquent act involved the illegal carrying, use, or possession of a firearm.

In the case *sub judice*, the record reflects that the juvenile court considered the foregoing factors in its judgment of disposition. At the disposition hearing, the juvenile court judge explained that J.K. committed two armed robberies within twenty-four hours. The juvenile court judge reiterated the seriousness of the

offenses – specifically the delinquent act of the attempted second degree murder of Ms. Mantle with a firearm as she was fleeing away from gunshots. The juvenile court acknowledged that J.K. had multiple opportunities to correct her behavior and cease committing the offenses, but J.K. failed to do so. After reviewing the record and given the severity of the crimes J.K. committed, we agree with the juvenile court that J.K. is in need of correctional treatment. Accordingly, this assignment of error lacks merit.

## CONCLUSION

Based on the foregoing, the juvenile court's judgment of J.K.'s delinquency and disposition are affirmed.

**AFFIRMED**